Case No. 04-11473

**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

RUDY RODRIGUEZ
*Plaintiff — Appellant*

v.

CONAGRA GROCERY PRODUCTS COMPANY
*Defendant — Appellee*

Appeal from the United States District Court for the Northern District of Texas, Civil Action No. 4:03-CV-055-Y

# BRIEF OF APPELLANT RUDY RODRIGUEZ

Donald E. Uloth
State Bar No. 20374200
ULOTH & PEAVLER, L.L.P.
3400 Carlisle Street
Suite 430, LB 23
Dallas, Texas 75204
Phone: (214) 999-0550
Fax: (214) 999-0551
Counsel for Appellant

# CERTIFICATE OF INTERESTED PERSONS

(1) Number and Style of the Case:

No. 04-11473
Rudy Rodriguez,
Plaintiff – Appellant

v.

ConAgra Grocery Products Company,
Defendant – Appellee

(2) The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| | |
|---|---|
| Plaintiff – Appellant: | Rudy Rodriguez |
| Counsel for Appellant: | Donald E. Uloth, Uloth & Peavler, L.L.P., Dallas, Texas. |
| Defendant – Appellee: | ConAgra Grocery Products Company, which is a wholly-owned subsidiary of ConAgra Foods, Inc., a publicly-traded company. |
| Counsel for Appellee: | Arthur T. Carter and Helen L. Thigpen, Haynes and Boone, L.L.P., Dallas, Texas. |

______________________________
Donald E. Uloth

## APPELLANT'S STATEMENT REGARDING ORAL ARGUMENT

Appellant projects that oral argument will be helpful to the Court. The district court's order granting Defendant's Motion for Summary Judgment is based on a novel and unprecedented interpretation of the Americans With Disabilities Act that conflicts with the basic notion that one must conduct an individualized inquiry of an applicant's abilities. This makes the present appeal a case of first impression, increasing the likelihood that the panel may have questions that are not fully answered by the briefs.

# TABLE OF CONTENTS


CERTIFICATE OF INTERESTED PERSONS .................................................... ii

APPELLANT'S STATEMENT REGARDING ORAL ARGUMENT .................. iii

TABLE OF CONTENTS ..........................................................................iv

TABLE OF AUTHORITIES .......................................................................vi

JURISDICTIONAL STATEMENT ..........................................................1

ISSUES PRESENTED FOR REVIEW ......................................................1

STATEMENT OF THE CASE..................................................................2

STATEMENT OF FACTS .........................................................................3

A. Rodriguez and the Job Offer.......................................................3

B. About Diabetes..............................................................................4

C. The Physical Examination ..........................................................7

D. ConAgra Withdrew the Job Offer for Safety Reasons ..............10

E. Rodriguez's Actual Condition and Control ...............................13

F. Evidence of "Control" .................................................................14

G. ConAgra's Misperception of Plaintiff's Condition was a Motivating Factor Behind its Decision ..........................................................16

SUMMARY OF THE ARGUMENT ......................................................16

STANDARD OF REVIEW .....................................................................19

Table of Contents (continued)

ARGUMENT ....................................................................................................20

I. Rodriguez Established Disability Under the "Regarded as" Subsection of the Definition ....................................................20

II. Rodriguez Proved he was Qualified for the Position..............................28

III. ConAgra Withdrew the Offer Because of the Perceived Disability ......31

IV. Evidence of Control ..............................................................................38

CONCLUSION ..............................................................................................40

CERTIFICATE OF SERVICE ......................................................................41

CERTIFICATE OF COMPLIANCE..................... (last page before the back cover)

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ..................................19

*Brookins v. Indianapolis Power & Light*,
90 F.Supp.2d 993 (S. D. Ind. 2000)..............................................................35

*Brown v. Lester E. Cox Medical Centers*,
286 F.3d 1040 (8th Cir. 2002) .......................................................................27

*Burroughs v. City of Springfield*,
163 F.3d 505 (8th Cir. 1998) .........................................................................35

*Cash v. Smith*,
231 F.3d 1301, (11th Cir. 2000) ....................................................................16

*Celotex Corp. v. Catrett*,
477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed2d 265 (1986) ........................... 19, 20

*Chaney v. New Orleans Pub. Facility Mgmt., Inc.*,
179 F.3d 164 (5th Cir.1999) ..........................................................................19

*Coleman v. Houston Indep. Sch. Dist.*,
113 F.3d 528 (5th Cir.1997) ..........................................................................19

*DeLuca v. Winer Indus., Inc.*,
53 F.3d 793 (7th Cir.1995) .......................................................................33, 34

*Eber v. Harris County Hosp. Dist.*,
130 F.Supp.2d 847 (S.D. Tex. 1991)............................................................16

*EEOC v. Chrysler Corp.*,
917 F.Supp 1164 (E.D. Mich. 1996), *rev'd on other grounds*
172 F.3d 48 (6th Cir. 1998) ..........................................................................20

*EEOC v. Exxon Corp.*,
203 F.3d 871 (5th Cir. 2000) .......... 18, 30-31

*EEOC v. Texas Bus Lines*,
923 F.Supp. 965 (S.D. Tex. 1996) .......... 25

*Fraser v. Goodale*,
342 F.3d 1032 (9th Cir. 2002) .......... 23

*Henderson v. Ardco, Inc.*,
247 F.3d 645 (6th Cir. 2001) .......... 26

*Herrera v. CTS Corp.*,
183 F.Supp.2d 921 (S.D. Tex. 2002) .......... 21

*Hewitt v. Alcan Aluminum Co.*,
185 F. Supp. 2d 183 (N.D. N.Y. 2001) .......... 36

*Holiday v. City of Chattanooga*,
206 F.3d 637 (6th Cir. 2000) .......... 25

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) .......... 20

*NME Hosps. v. Rennels*,
994 S.W.2d 142 (Tex. 1999) .......... 21

*Rizzo v. Children's World Learning Centers, Inc.*,
84 F.3d 758 (5th Cir. 1996) .......... 20

*Siefken v. Village of Arlington Heights*,
65 F.3d 664 (7th Cir. 1995) .......... 18, 22, 33, 34

*Sutton v. United Air Lines, Inc.*,
527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) .......... 21-22, 36, 39

*Tangires v. Johns Hopkins Hospital*,
79 F. Supp. 2d 587 (D. Md. 2000) .......... 35-36

*Taylor v. Pathmark Stores, Inc.*,
177 F.3d 180 (3rd Cir. 1999) .................................................................. 26-27

*Toyota Motor Mfg. v. Williams*,
534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002). ................................23

*Union Carbide Corp. v. Mayfield*,
66 S.W.3d 354 (Tex. App.—Corpus Christi 2001, pet. denied) ...................24

*Van Stan v. Fancy Colours, Inc.*,
125 F.3d 563 (7th Cir. 1997) .....................................................................35

*Vela v. City of Houston*,
276 F.3d 659 (5th Cir. 2001) .................................................................. 19-20

**<u>Statutes</u>**

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1332 ...................................................................................1

TEX. LAB. CODE § 21.001(3) .....................................................................21

TEX. LAB. CODE § 21.002(6) ........................................................... 2, 21, 24

TEX. LAB. CODE § 21.051 ......................................................................... 2, 21

Americans with Disabilities Act,
42 U.S.C. § 12101, et seq. .........................................................................21

42 U.S.C. § 12112(b)(2) .............................................................................25

42 U.S.C. § 12113(b) .................................................................................30

29 C.F.R. § 1630.2(h)(1). ..........................................................................23

29 C.F.R. § 1630.2(i). ......................................................................... 24, 27

29 C.F.R. § 1630.2(j)(3)(i). .........................................................................24

29 C.F.R. § 1630.2(r). ........................................................................................30

**Rules**

Fed.R.Civ.P. 56(c)..........................................................................................19

## JURISDICTIONAL STATEMENT

1. The district court had diversity jurisdiction pursuant to 28 U.S.C. § 1332.

2. This court has jurisdiction under 28 U.S.C. § 1291.

3. The filing dates establishing the timeliness of the appeal are as follows. The district court entered its Final Judgment on September 16, 2004; Plaintiff timely filed a motion for new trial on September 30, 2004; the district court denied the motion by order dated November 3, 2004; Plaintiff timely filed a notice of appeal on December 3, 2004.

4. This is an appeal from a final judgment disposing of all claims and parties.

## ISSUES PRESENTED FOR REVIEW

I.

The trial court erred by granting Defendant's Motion for Summary Judgment.

II.

The trial court erred by denying, and by failing to grant, Plaintiff's Motion for Partial Summary Judgment.

## STATEMENT OF THE CASE

The sole cause of action in this case is a claim of disability discrimination in violation of the Texas Labor Code. Section 21.002(6) of the Labor Code defines the term "disability," and section 21.051 of the Labor Code makes it an unlawful employment practice to fail to hire an individual because of a disability. ConAgra violated this statute by withdrawing a job offer to Rodriguez because they regarded him as having a disability that posed such a safety risk that he was unfit for any conceivable kind of job.

On March 5, 2002, just four days after his job offer was withdrawn, Appellant pursued his administrative remedies by filing a charge of discrimination with the EEOC. 1 R 30. There was no reconciliation and the EEOC issued a notice of right to sue dated June 27, 2002. 1 R 31. Appellant filed this lawsuit in state court on August 21, 2002. 1 R 11. ConAgra removed the case to federal court on September 12, 2002, but it was remanded to state court by order dated November 12, 2002. ConAgra removed the case again on January 28, 2003, 1 R 1, and the case has proceeded in federal court since that time.

Both sides moved for summary judgment on October 31, 2003. 2 R 394 (Plaintiff's Motion for Partial Summary Judgment) and 2 R 277 (Defendant's Motion for Summary Judgment). On September 16, 2004 the district court issued its Order Granting Defendant's Motion for Summary Judgment, in which the court

also denied Plaintiff's Motion for Partial Summary Judgment. 3 R 748. The district court issued its Final Judgment that same day. 4 R 759. Plaintiff timely filed a motion for new trial seeking reconsideration of the order and judgment on September 30, 2004, 4 R 785, which was denied by order dated November 3, 2004. 4 R 800. Plaintiff timely filed a notice of appeal on December 3, 2004. 4 R 804.

## STATEMENT OF FACTS

### A. Rodriguez and the Job Offer

Rudy Rodriguez has worked manual labor jobs for most of his adult life; many of these jobs have been physically demanding requiring lots of heavy lifting and hard work. Ex. 37 p.1. In 1997, when he was approximately 45 years old, he was diagnosed with type 2 diabetes. Since then he has had to exercise, watch his diet, and take medication, but otherwise diabetes has not affected his life. Ex. 32 pp.3-4.

On January 25, 2002 Rodriguez began working at the Ranch Style Beans plant in Fort Worth, Texas doing heavy manual labor, such as unloading deliveries and lifting heavy sacks of beans. Ex. 37 p.1. ConAgra Grocery Products Company ("ConAgra") owns and operates the plant (Ex. 32 p.17; Ex. 37 p.22 line 24 to p.23 line 13), but from January 25, 2002 through March 1, 2002 Rodriguez worked there as a temporary, having been placed there by a staffing agency. Ex. 32 p.17; Ex. 37 p.1.

Based on the quality of Rodriguez's work, a supervisor recommended to the Human Resources Manager, Elza Zamora, that ConAgra should offer Rodriguez a job. Ex. 37 pp.47-8. In late February 2002 Rodriguez was offered a job as a "Production Utility" in the plant's production area. Ex. 37 p.47 line 5 to p.48 line 21, and p.51 line 3 to p.52 line 6. The job description for this position is in the summary judgment record at Ex. 37 pp.94-95, and the duties described therein are the same as what Plaintiff had been doing for the weeks preceding the job offer. The offer was contingent upon Plaintiff passing a drug screen and a physical exam. Ex. 37 p.51-2; Ex. 32 pp.23-24.

**B. <u>About Diabetes</u>**

Diabetes is an incurable disease affecting the way the body obtains energy from food. During normal digestion the body changes sugars, starches, and other foods into a form of sugar called glucose. The blood carries this glucose to cells throughout the body where, with the help of insulin (a hormone produced by the beta cells in the pancreas), glucose is changed into quick energy for the cells to use or store for future needs. Exhibit 37 p.5, and pp.175-176.

Diabetes causes something to go wrong with the normal process of turning food into energy. A person with diabetes digests food into glucose readily enough, but there is a problem with insulin. In type 1 diabetes, the pancreas either stops making insulin or makes only a tiny amount. In type 2 diabetes the pancreas

makes insulin, but either it makes too little or the body has trouble using the insulin, or both. When insulin is absent or ineffective, the cells cannot properly use the glucose in the bloodstream to make energy. Thus, glucose collects in the blood leading to the high glucose levels, or "hyperglycemia," that is the defining characteristic of untreated diabetes. Exhibit 37 p.6.

Because type 1 and type 2 diabetes are incurable, the treatment goal for a person with diabetes is to maintain his blood glucose within a certain range over time. Treatment regimens for people with type 2 diabetes vary greatly depending on the individual, and many of these individuals can control their blood glucose levels through proper diet and exercise, without medication. The health and safety concerns for a person with type 2 diabetes are mostly long term; if glucose levels remain elevated for long periods of time, the excess glucose in the body can damage various organs and systems within the body. However, in the short term there is absolutely no health or safety risk posed by elevated, even high blood glucose levels. A person’s blood glucose level would have to get up above 600 to 700 milligrams of glucose per deciliter of blood before a person would start being at risk for short term complications such as passing out or diabetic coma. Ex. 37 p.6; Ex. 38 pp.199-207.

For decades blood glucose levels have been measured using blood tests that measure milligrams of glucose per deciliter of blood. Glucose levels vary

constantly depending on many factors, and glucose tests usually distinguish between fasting and non-fasting glucose levels. For a fasting blood glucose test, a score of 60 to 110 is considered normal; anything between 110 and 126 is considered borderline, and anything over 126 is considered to be symptomatic of diabetes. Ex. 37 p.6-7; Ex. 38 p.176.

Another test, which has been widely available for over a decade, is the hemoglobin A1C. This test measures the amount of glucose adhering to red blood cells in the body. Because these cells last for up to three months before they are flushed out of the bloodstream, the A1C can shows what a person's blood glucose level has been on the average over a two to three month period. For a person with diabetes seeking to avoid long-term complications, the goal is to keep one's A1C level at 7 or below. Ex. 37 p.7; Ex. 38 p.225.

The two blood tests described above are the best ways to check a person's blood glucose levels. A urinalysis can indicate that glucose is spilling out of the body and into the urine, but it does not measure a person's blood glucose level at all, and it cannot tell a physician anything about the patient's blood glucose level or his control over time. Ex. 38 p.309 lines 2-19. All the urinalysis does, as it relates to glucose, is to measure the *density* of the glucose levels present in the urine. The presence of glucose in the urine might simply indicate a very temporary spike caused by the recent consumption of a Coke or a glass of orange juice. Ex.

37 p.7; Ex. 38 pp.208-211. A physician should not make decisions regarding diabetes based solely on a urinalysis. Ex. 38 p.211-220.

## C. The Physical Examination

ConAgra had a standing contractual arrangement to have all of its pre-employment physicals done by Occupational Health Solutions ("OHS"). Ex. 37 p.55 lines 10-21. ConAgra paid OHS thirty dollars for each physical exam (Ex. 37 p.55 line 1), and every physical performed by OHS included only those tests and procedures that were pre-approved by ConAgra. Ex. 37 p.58 and p.117. Unfortunately, the standard package did not include a blood test. Ex. 37 p.117.

ConAgra arranged for Rodriguez to go to OHS for his physical on March 1, 2002. Ex. 32 p.25; Ex. 37 pp.2, 54, 111, and 141. A staff member at OHS took some information from Plaintiff, and noted on Plaintiff's chart that he took medications for high blood pressure and diabetes. Ex. 37 pp.2, 112, and 141.

The doctor at OHS who did the physical, Jerry W. Morris, D.O., had very little information about Rodriguez or the position for which he was being screened. Dr. Morris did not know that Rodriguez had already been working in the production department at the Ranch Style Beans factory for several weeks. Ex. 37 p.128 lines 21-24. Dr. Morris was supposed to assess whether Rodriguez was medically qualified for the position, but he did not even know what the position was. As Dr. Morris testified:

Q: Do you know what job he was applying for?
A: No.

Q: Have you ever been to the Ranch Style Beans factory where he had been offered employment?
A: No.

Q: Do you know what kinds of machinery he would be working around?
A: No.

Q: Or what kinds of equipment?
A: No.

Ex. 37 p.123 lines 6-15. On one of the forms he signed there was a line for him to write down the position for which Plaintiff was applying, and Dr. Morris wrote: "Position: None stated." Ex. 37 p.144. Dr. Morris testified that ConAgra had not provided him with anything describing the job Plaintiff had been offered (Ex. 37 p.126 lines 23-25), and he did not have any data or restrictions from the employer applicable to the position. Ex. 37 p.109 lines 4-6, and p.110 lines 2-4.

The oral medical history and physical exam confirmed that Rodriguez was *not* experiencing any physical or mental problems related to his diabetes. Rodriguez told Dr. Morris that his diabetes was controlled and that it had *never* caused him any problems. Ex. 32 pp.28, 31; Ex. 37 p.2, p.114 lines 12-13, and p.133 lines 8-13. Dr. Morris observed no ill-effects attributable to diabetes:

Q: During your examination, did you observe any impairment of him mentally or physically from his diabetes?
A: **No.**

Ex. 37 p.114 line 25 to p.115 line 2. Dr. Morris did a urinalysis, which showed an elevated concentration of glucose in Plaintiff's urine (Ex. 37 p.143), but Dr. Morris saw no signs that this had any effect on Plaintiff:

> Q: … what was it about the elevated glucose level … what effect was that having on Rudy Rodriguez?
> A: As I stated, none that I could discern on his physical exam that day.

Ex. 37 p.130 line 23 to p.131 line 3. Dr. Morris could have done a blood test on Rodriguez, but he chose not to because of the restrictions in place from ConAgra:

> Q: Did – did you do a blood test on Mr. Rodriguez?
> A: No.
>
> Q: Do you have glucose meters for blood testing at Occupational Health Solutions?
> A: Yes.
>
> Q: But that just isn't part of the package when you do a pre-employment physical?
> A: That's correct.

Ex. 37 p.117 lines 3-11. Based on the urinalysis results, Dr. Morris told Rodriguez that his diabetes was uncontrolled. Rodriguez disagreed and told Dr. Morris: "I had a complete physical not even two months ago and my physical was all right and I was taking pills for it and everything and I never had no trouble." Ex. 55 pp.92-93.

Unpersuaded, Dr. Morris completed a Medical Qualification form on which he checked the box next to the statement "Not medically qualified to perform this job." In the comments section he wrote "Uncontrolled diabetes." Ex. 37 pp.117, 144.

**D. <u>ConAgra Withdrew the Job Offer for Safety Reasons</u>**

Rodriguez took the Medical Qualification form to Zamora, the HR manager at ConAgra. Ex. 37 p.2. According to Rodriguez, Zamora said she had already talked to Dr. Morris (Ex. 32 p.32); Zamora denies this and claims Dr. Morris had not called her before Rodriguez arrived back at the plant with the paperwork. Ex. 32 pp.50-51. Either way, it is undisputed that Zamora promptly told Rodriguez he would not be hired because he had failed the physical, and Dr. Morris "was not medically recommending him for employment." Ex. 37 p.2, and p.61 line 11 to p.62 line 11. Rodriguez tried to get her to call his doctor but she would not do so; she told him she had to go with the decision made by Dr. Morris. Ex. 32 p.33; Ex. 55 p.012.[1]

In her deposition Zamora testified that she was familiar with diabetes because they had other employees with diabetes at the plant, and her mother had diabetes. Ex. 32 p.55. But her testimony reveals that she has serious misconceptions about the condition – she thought, based on her anecdotal

---

[1] Zamora denies this and says that after being told he had not passed the physical, "he didn't dispute anything and left." Ex. 32 p. 52.

experience with diabetes, that "uncontrolled diabetes" meant a person with diabetes who was not taking any medication. Ex. 37 p.69 lines 2-25, and p.82 line 3 to p.83 line 1. Her belief was incorrect; as both Dr. Morris and Dr. Garcia testified, not all persons with diabetes need to take medication. Ex. 37 p.6, and p.115 lines 16–17. Zamora erroneously believed that all people with diabetes take medication. Ex. 32 p.63. She also testified that she *knew* "if they're not taking their medication on time and if they are not eating the proper foods at specific times, it could cause them to become dizzy and possibly blackout." Ex. 32 p.55. Thus, despite her professed familiarity with the disease, Zamora had serious misperceptions regarding diabetes. Even so, she did not bother to ask anyone what "uncontrolled diabetes" actually meant before withdrawing Plaintiff's job offer. Ex. 37 p.81-82. Rather, she acted upon her own misperceptions and stereotypes.

As for her knowledge of the position, Zamora was nearly as uninformed as Dr. Morris:

> Q: Can you give me an idea of, you know, what a production utility employee does during an average workday?
> A: No, I couldn't.

Ex. 37 p.37 lines 15-18. When dealing with new applicants she could not describe the duties of the entry-level positions, and she would simply refer them to the written job description. Ex. 37 p.37 line 19 to p.38 line 16.

ConAgra regarded Plaintiff as substantially impaired with respect to several major life activities and unable to perform a broad class of jobs. When asked about the risks that she was afraid of, Zamora testified that in a manufacturing environment with running equipment and sharp objects, people with diabetes "could certainly endanger themselves" and "could hurt themselves." Ex. 37 p.71 lines 4-25. Zamora was afraid that Plaintiff might "become dizzy and possibly blackout." Ex. 37 p.70 line 12. Further, she believed that if a person with diabetes passed out he would not be able to perform several of life's major activities such as seeing, hearing, walking, standing, reasoning, taking care of himself, operating equipment, being aware of his surroundings, driving a forklift, communicating, or lifting heavy objects. Ex. 37 p.72-73.

ConAgra had many types of jobs at its bean factory, but remarkably the company insists that Plaintiff was not qualified for *any* position at the plant, or any other conceivable type of job for that matter. Ex. 37 p.14 and p.127. It is therefore clear that ConAgra regarded Plaintiff as being foreclosed not just from this one job, but from many jobs.

Zamora perceived Rodriguez as a safety risk, but she did not evaluate the nature of the perceived risk. When asked: "did you quantify it in some way" she replied: "I was relying on Dr. Morris." Ex. 37 p.79 lines 21-25. Zamora did not know whether Dr. Morris or anyone else had ever analyzed the nature and severity

of the risk, and Zamora had no idea whether the risk was slight or great. Ex. 37 p.80 line 3 to p.81 line 1. At no point did either Zamora or Dr. Morris consider possible accommodations. Ex. 37 p.81 lines 10-24, and p.127 line 25 to 128 line 4.

### E. <u>Rodriguez's Actual Condition and Control</u>

There is no evidence in the summary judgment record that Rodriguez was ever actually affected or limited by diabetes, and from his medical records his glucose control is well known. According to the records he had the following scores:

| Date | Fasting Blood Glucose | Hemoglobin A1c |
|---|---|---|
| 2/22/2000 | **296** | **12.4** |
| 5/6/2000 | **238** | |
| 10/6/2000 | **221** | |
| 5/5/2001 | **312** | |
| 5/18/01 | **146** | **10.6** |
| 8/7/2001 | **139** | **7.7** |
| 3/1/2002 | **??? (the date of ConAgra's physical)** | |
| 12/3/2002 | **73** | |
| 12/27/2002 | **97** | |
| 5/5/2003 | **108** | **6.9** |
| 5/20/2003 | **86** | **6.9** |

Ex. 37 p.8. Even at the highest blood glucose levels shown above, Rodriguez was not at any increased risk of becoming dizzy, passing out, or suffering any physical or mental impairment of any kind because of his diabetes. *Id.* Over time Rodriguez gained greater control over his blood glucose levels, especially after May 5, 2001 when his physician switched his medication to Glucovance. Just two

weeks after switching to Glucovance Rodriguez's fasting blood glucose dropped from 312 to 146, and at all times thereafter Rodriguez has maintained his blood glucose at acceptable levels. *Id.*

Rodriguez has never suffered any complications from diabetes. Ex. 37 pp.1-3, and p.8. During 2002, the year in which the discrimination occurred, Rodriguez's fasting blood glucose level was consistently near or below 100, which is within the normal range even for a person who does not have diabetes. Ex. 37 p.8-9.

**F. <u>Evidence of "Control"</u>**

People with diabetes commonly check their own blood glucose levels daily and the treating physician relies on the patient to give an accurate history of their condition. Ex. 32 pp.68, 103. In his affidavit Rodriguez stated:

> At no time in my life have I experienced any physical or mental problem, other than a temporary illness or injury, that has affected my ability to work. I exercise regularly, I take my prescribed medications regularly, and I check my blood sugar at least once each day. Since switching to Glucovance in May 2001, my blood sugar levels have been consistently low and my doctor has not adjusted my diabetes treatment regimen.

Ex. 37 p.3. In a report from Dr. Garcia that was included as an exhibit to his deposition, Dr. Garcia stated: "He has never been completely out of control on his diabetes, he has never had any complications related to his diabetes." Ex. 38 p.385. Rodriguez saw his treating physician about two months prior to the

physical at ConAgra, and in his notes he wrote: "He has a history of diabetes and hypertension, which have been pretty well controlled." Ex. 38 p.388. Consistent with his report and the notes from his recent physical, Garcia later testified by affidavit that at the time of the physical: "His diabetes was not then and is not now uncontrolled – to the contrary, his diabetes was then and is now well controlled." Ex. 37 p.9.

Dr. DeFronzo testified that after switching to Glucovance in May 2001, many months before the physical, Plaintiff's glucose control ranged from "pretty good control" to "very good control." Ex. 38 pp.305-306. Dr. DeFronzo testified: "I would say every piece of information in the medical record says that his diabetes was under reasonable control from after the time he was started on Glucovance." Ex. 32 p.139. Dr. DeFronzo allowed that there could have been intervals where Rodriguez had high blood sugar, out of the target range, but even then Rodriguez would not have presented a safety risk. *Id.* Dr. DeFronzo observed that if Rodriguez had been poorly controlled for a long period of time one might expect to see some physical signs of damage, but there were none. Ex. 32 p.140.

ConAgra asserts there is evidence that Plaintiff was at times noncompliant with his diet and medication, but (a) there is no evidence that this was true at or near the time of ConAgra's pre-employment physical on March 1, 2002, and (b)

more importantly, there is no evidence that such noncompliance, if any, caused Plaintiff's diabetes to make him a safety risk at or near the time of the physical.[2]

### G. ConAgra's Misperception of Plaintiff's Condition was a Motivating Factor Behind its Decision

ConAgra's interrogatory answers and the deposition testimony of its witnesses show that ConAgra believed Rodriguez was qualified for the position, but because they erroneously believed he was not controlling his blood glucose levels they feared he was a safety risk. Ex. 37 pp.12-13, pp.47-51, p.77, and pp. 119-120.

## SUMMARY OF THE ARGUMENT

The facts of the present case perfectly illustrate "regarded as" disability discrimination by an employer that completely misunderstood a qualified applicant's impairment. The elements of this claim are: (1) that Plaintiff has a "disability," (2) that he was qualified for the position, and (3) the offer was withdrawn because of the disability. On the summary judgment record below, Plaintiff established each element as a matter of law.

*Qualifications*. Plaintiff has diabetes, but this has never affected him or limited his ability to work. For several weeks he worked at the Ranch Style Beans plant as a temporary, and he did such a good job that he was offered full-time

[2] Disability is determined as of the time of the discriminatory action. *See, e.g.*, *Cash v. Smith*, 231 F.3d 1301, 1306 n. 5 (11th Cir. 2000); *Eber v. Harris County Hosp. Dist.*, 130 F.Supp.2d 847, 858 (S.D. Tex. 1991).

employment at ConAgra. There is no dispute that he met the standards that ConAgra sets for its employees. There is therefore no question as to his qualifications.

*Disability*. ConAgra withdrew the job offer because of the erroneous conclusions that it drew from the results of a urinalysis. It is undisputed that a urinalysis reveals nothing about the actual condition of a person with diabetes or the effect diabetes is having on the individual in question, but based on the test results ConAgra jumped to the conclusion that Plaintiff's diabetes was so disabling that he was unfit *for any conceivable job*. There is no evidence in the record – none – supporting ConAgra's perception that Plaintiff was unemployable because he was such a safety risk, whereas there is uncontroverted evidence that Plaintiff was not a safety risk to himself or others. When an employer perceives an applicant to be foreclosed from a broad range of jobs, the employer regards the applicant as having a disability. There is therefore no question that Plaintiff was a qualified individual with a disability.

*Because of a Disability*. Both the Texas Labor Code and the ADA prohibit a covered entity from discriminating against a qualified individual because of a disability. The evidence is undisputed that ConAgra withdrew the job offer because of Plaintiff's diabetes and its perception that Plaintiff was a safety risk.

There is therefore no question that ConAgra discriminated against Plaintiff because of a disability.

According to *EEOC v. Exxon Corp.*, 203 F.3d 871 (5th Cir. 2000), if an employer rejects an individual applicant for safety reasons unrelated to a general policy, the employer must show that its action was justified under the direct-threat analysis. For strategic reasons ConAgra did not raise the direct-threat defense, and even though Plaintiff raised and thoroughly briefed this issue the district court ignored it.

Instead, the district court's analysis hinged entirely on a misinterpretation of several cases, beginning with *Siefken v. Village of Arlington Heights*, 65 F.3d 664 (7th Cir. 1995). *Siefken* held that when an employee fails to control a controllable condition and the *effect* of that failure is the person's inability to perform the job, then the employee cannot establish a disability-discrimination claim because he cannot meet the employer's legitimate expectations. The Plaintiff in this case had no problems on the job and was clearly meeting expectations, so the *Siefken* rationale does not apply. But the district court misapplied *Siefken* for the proposition that a failure to control a controllable condition, in and of itself, bars a disability-discrimination claim. Consequently, the court held that plaintiff could not maintain his claim because of ConAgra's erroneous perception that his diabetes was "uncontrolled" and despite evidence in the record showing that his diabetes

was in fact "under control." This analysis controvert's the law's requirement that the capabilities and limitations of individuals with disabilities be assessed individually and as they actually exist.

Plaintiff established ConAgra's liability as a matter of law. This Court should therefore reverse the judgment of the district court and render judgment for Plaintiff as to liability and remand for further proceedings. In the alternative Plaintiff requests a remand to the district court on all issues.

## STANDARD OF REVIEW

The Fifth Circuit reviews a summary judgment de novo, applying the same standards that apply to the district court's consideration of the summary judgment motion. This standard, as described by the Fifth Circuit, is as follows:

> We review a grant of summary judgment de novo, applying the same standard as the district court. *See Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 167 (5th Cir.1999). Summary judgment is proper when "there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). While we view the evidence in a light most favorable to the non-movant, *see Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir.1997), in order to avoid summary judgment, the non-movant must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed2d 265 (1986). If the evidence is such that a reasonable jury could return a verdict for the non-movant, there is a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, if the non-movant fails to present facts sufficient to support an essential element of his claim,

> summary judgment is appropriate. *See Celotex*, 477 U.S. at 322-23, 106 S.Ct. 2548.

*Vela v. City of Houston*, 276 F.3d 659, 666 (5th Cir. 2001).

## ARGUMENT

To establish discrimination under the Texas Commission on Human Rights Act ("TCHRA"), Rodriguez must prove: (1) that he has a "disability" within the meaning of the statute (which includes perceived disabilities); (2) that he was qualified for the position he was offered; and (3) that the job offer was withdrawn because of the perceived disability. *Rizzo v. Children's World Learning Centers, Inc.*, 84 F.3d 758, 763 (5th Cir. 1996); *EEOC v. Chrysler Corp.*, 917 F.Supp 1164, 1167 (E.D. Mich. 1996), *rev'd on other grounds* 172 F.3d 48 (6th Cir. 1998).[3] The following sections address the statutory requirements of each element.

### I. Rodriguez Established Disability Under the "Regarded as" Subsection of the Definition

To be protected by the TCHRA, Plaintiff must establish that he is a person with a disability within the meaning of the statute. Rodriguez meets the statutory definition because: (a) ConAgra perceived his diabetes to be so limiting that it foreclosed him from performing any jobs in its manufacturing plant, and (b)

---

[3] In the district court ConAgra argued the application of the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). However, as this Court has held, that analysis does not apply where the employer admits its motive and that motive is undisputed. *Rizzo v. Children's World Learning Centers, Inc.*, 84 F.3d at 762. The district court rejected ConAgra's contentions on this point and correctly stated the elements of Plaintiff's claim. 4 R 751-752.

ConAgra feared Plaintiff would suffer episodes where he would be substantially limited in his ability to perform a number of other major life activities besides working. The district court agreed with Plaintiff on this point. 4 R 752, n.3 (holding that Rodriguez raised a question of fact on this issue).

The Texas legislature modeled the TCHRA after federal civil-rights laws and intended the act's prohibition against disability discrimination to parallel Title I of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*. (the "ADA"). *Herrera v. CTS Corp.*, 183 F.Supp.2d 921, 925 (S.D. Tex. 2002); *NME Hosps. v. Rennels*, 994 S.W.2d 142, 144 (Tex. 1999); TEX. LAB. CODE 21.001(3). Thus, when interpreting the disability-discrimination provisions of the TCHRA, courts are guided by the ADA, the EEOC's interpretive guidelines, and federal case law interpreting and applying the ADA. *NME Hospitals*, 994 S.W.2d at 144.

The TCHRA prohibits discrimination against a qualified applicant because of a disability. TEX. LAB. CODE § 21.051. Like the ADA, the TCHRA definition of the term "disability" contains three sub-parts:

> "Disability" means, with respect to an individual, [1] a mental or physical impairment that substantially limits at least one major life activity of that individual, [2] a record of having such an impairment, or [3] being regarded as having such an impairment.

TEX. LAB. CODE § 21.002(6). The present case is based only on the third sub-part, and there are two types of "regarded as" claims: (1) an employer mistakenly

believes a person has a substantially limiting impairment that he does not really have; or (2) the person has a nonlimiting impairment, but the employer mistakenly believes it to be substantially limiting. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999).

This case falls into the second category. Rodriguez has an impairment (diabetes) that is not substantially limiting, but ConAgra mistakenly believed he was so substantially impaired that he was unsafe for any job, whether in its manufacturing plant or elsewhere. The present case is analogous to the type of regarded as case that Justice O'Connor described in her *Sutton* majority opinion. As an example of a valid regarded as case Justice O'Connor wrote:

> [O]ne whose high blood pressure is "cured" by medication may be regarded as disabled by a covered entity, and thus disabled under subsection (C) of the definition. The use or nonuse of a corrective device does not determine whether an individual is disabled; that determination depends on whether the limitations an individual with an impairment *actually* faces are in fact substantially limiting.[4]

*Id.* at 488 (emphasis in original). While diabetes cannot be "cured," the logic of the foregoing quotation applies with equal force. The relevant analysis requires the court to contrast the employer's perception with the limitations (if any) that Rodriguez actually faces. Ignoring the reality – what limitations the individual

[4] This point is critical in understanding how the district court misinterpreted *Siefkin v. Village of Arlington Heights*, 65 F.3d 664 (7th Cir. 1995), as explained below at pp. 31-33. The use or non-use of a corrective measure, in a vacuum, means nothing; the important inquiry is whether the employee is actually substantially impaired.

actually faces – is proscribed by *Sutton*. *Id.* at 482-484. "[W]hether a person has a disability under the ADA is an individualized inquiry." *Id.* at 483. This is especially true when considering impairments like diabetes that have widely varying effects from person to person. *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 199 (2002). The district court's opinion failed to make an individualized inquiry, contrary to the statutory framework of the ADA/TCHRA.

It is undisputed that Plaintiff, the individual in question in this case, has an impairment. According to EEOC regulations, a physical impairment means:

> Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine.

29 C.F.R. § 1630.2(h)(1). Diabetes is an impairment of the digestive, hemic, and endocrine systems. *See, e.g., Fraser v. Goodale*, 342 F.3d 1032, 1038 (9th Cir. 2002). Diabetes is the impairment at issue in this case – not uncontrolled diabetes. Defendant argued below, and the district court apparently accepted, that the outcome of this case depends on whether "uncontrolled diabetes" is an impairment under the ADA and the TCHRA. However, it is undisputed that Rodriguez has diabetes, and Defendant has cited no authority to suggest that diabetes is not an impairment. The proper analysis, therefore, is whether Defendant perceived

Rodriguez's diabetes as substantially limiting, and the evidence clearly shows that Defendant did so perceive it.

For an impairment to rise to the level of a "disability" under the statute, the impairment must substantially limit one or more major life activities of the individual in question. TEX. LAB. CODE § 21.002(6). Neither the TCHRA nor the ADA define the term "major life activities," but according to EEOC regulations:

> Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

29 C.F.R. § 1630.2(i). *See also Union Carbide Corp. v. Mayfield*, 66 S.W.3d 354, 360 (Tex. App.—Corpus Christi 2001, pet. denied) (citing the EEOC's definition with approval). Although there has been some dispute as to which major life activities are at issue in this case, neither party disputes that working is one of the major life activities at issue.

Regarding the major life activity of working, "substantially limits" means:

> … significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.

29 C.F.R. § 1630.2(j)(3)(i). ConAgra has admitted that it believed Rodriguez was incapable of performing any positions within the broad range of jobs available at its manufacturing plant – in response to an interrogatory, ConAgra stated:

> **Interrogatory No. 7:** Was Plaintiff qualified for any other positions at ConAgra Foods? Please include in your answer any positions for which he would have been qualified with reasonable accommodation on your part.
>
> **Answer:** No.

Ex. 37 p.14.

Both Zamora and Dr. Morris entertained grave misperceptions about the limitations diabetes might place on Rodriguez. Zamora believed that Rodriguez was prone to becoming dizzy and blacking out. Ex. 37 pp.70-71. She also had concerns about Plaintiff's ability to operate equipment, drive a forklift, or lift heavy objects, and she feared Plaintiff might be unaware of his surroundings and therefore unable to get out of the way if a forklift went by. Ex. 37 p.74 lines 4-20. Dr. Morris believed that Plaintiff was unfit for *any* job: **"outside of a padded room where he could even then fall and break his neck from dizziness or fainting, I don't know that there would be a safe environment that we could construct."** Ex. 37 p.32 lines 18-21.[5] He also testified that he was concerned

[5] Because of its contractual arrangement with OHS, ConAgra is liable for any discrimination that resulted from Morris's misperceptions. 42 U.S.C. § 12112(b)(2) (defining "discriminate" to include any contractual arrangement that ultimately subjects a qualified applicant to discrimination). See also *Holiday v. City of Chattanooga*, 206 F.3d 637, 643 (6th Cir. 2000) ("Employers do not escape their legal obligations under the ADA by contracting out certain hiring and personnel functions to third parties."); *EEOC v. Texas Bus Lines*, 923 F.Supp. 965 (S.D. Tex. 1996) (employer sent plaintiff to an outside clinic, doctor denied medical certification based on a perceived disability that was "not supported by any objective medical findings", *id.* at 973, employer was held liable for ADA violation).

Plaintiff would pose a safety risk in any job, not just the particular one Plaintiff was offered.

> Q: How, then were you able whether Rudy Rodriguez was able to perform the essential functions of the job that he was applying for?
> A: I didn't make that determination.
>
> Q: What determination did you make?
> A: I assessed the risk that he might fail on any job and determined that it was excessively risky to permit him to proceed in – in the condition in which he presented himself in my office.

Ex. 37 p.127. He further testified that *any person* whose urinalysis was at the same level as Plaintiff's would not be medically qualified for *any* manual labor job. Ex. 37 p.125 lines 17-21.

ConAgra will no doubt argue, as it did below, that it only believed Rodriguez to be unfit for one particular job and that this is insufficient to show he was perceived as substantially limited with respect to working. However, the evidence cited in the preceding paragraphs shows that ConAgra perceived Rodriguez to be unfit for any job at the plant, or any other conceivable type of job for that matter. Under these circumstances it is clear that ConAgra regarded him as substantially limited with respect to working. *See, e.g., Henderson v. Ardco, Inc.*, 247 F.3d 645, 654 (6th Cir. 2001) (employer perceived plaintiff to be unfit for any of the jobs at tits manufacturing plant); *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 188 (3rd Cir. 1999) (employer perceived employee could not perform a wide

range of jobs, and the Third Circuit found this sufficient to make out a regarded as claim). The district court agreed that Plaintiff raised a question of fact on this issue. 4 R 752 n. 3 ("[T]he Court is not convinced that Rodriguez has not at least demonstrated a question of fact regarding this issue, given that he has presented testimony from Zamora tending to indicate that she considered Rodriguez to be disqualified from any position at the plant as a result of his uncontrolled diabetes.")

The record shows that ConAgra perceived Rodriguez as substantially limited in a number of other major life activities in addition to working. Zamora feared that Rodriguez might "become dizzy and blackout" and cause harm to himself or others. Ex. 37 pp.70-71. She agreed that if this happened, Plaintiff would be unable to perform several major life activities, including seeing, hearing, walking, standing and reasoning consciously. Ex. 37 p.72. Seeing, hearing, walking, standing, conscious reasoning, taking care of oneself, and communicating are defined as major life activities. 29 C.F.R. § 1630.2(i); *Brown v. Lester E. Cox Medical Centers*, 286 F.3d 1040, 1045 (8th Cir. 2002) (the "ability to perform cognitive functions on the level of an average person" is a major life activity).

Thus, as a matter of law, Plaintiff had a disability because ConAgra regarded him as being substantially limited in at least one major life activity.

## II. <u>Rodriguez Proved he was Qualified for the Position</u>

There is no genuine issue of fact regarding Rodriguez's qualifications. He worked several weeks for ConAgra in the production department as a temporary, and he did so well at his job he was offered permanent employment. ConAgra's safety concerns are not relevant to the issue of qualification; they are relevant only to the direct-threat analysis that ConAgra has clearly decided not to raise as an issue in this case.

During the weeks he worked as a temporary in the production utility department, Rodriguez was supervised by Bob Smith. Smith observed Rodriguez's work and evaluated his performance, and when full-time positions came open Smith recommended to the HR manager, Zamora, that ConAgra should hire Rodriguez. Ex. 37 pp.47-48. At the very least, this raises a fact issue that Rodriguez was qualified. Further on this point, Zamora testified that when the conditional job offer was extended ConAgra believed that Rodriguez was qualified for the job and could perform its essential functions:

> Q: Do you know why he [Rodriguez] was offered a job?
> A: It was based on the recommendation of Bob [Smith].
>
> Q: And was Bob, essentially, saying Rudy seems qualified to do the job of a production utility?
> A: Yes.

Ex. 37 p.51. Later in her deposition Zamora testified:

Q: … Rudy had worked there for several weeks and done well enough to be offered a job, correct?
A: Yes.

* * *

Q: Did you believe that he [Plaintiff] lacked any of the skills, any of the essential job functions listed on the job description to work at ConAgra?
A: No.

Ex. 37 pp.76-77. ConAgra now claims that Plaintiff was not qualified for the position because of his diabetes, but the evidence proves otherwise and shows that ConAgra's current claim is merely a litigation stance. The evidence shows that the real reasons for the employment decision were related solely to ConAgra's concern about safety and the potential for injuries. Ex. 37 p.77 line 11 to p.78 line 3. As ConAgra's interrogatory answers make clear, Plaintiff's job offer was withdrawn solely because of ConAgra's belief that he was unsafe due to his diabetes. Ex. 37 pp.12-13.[6] The testimony of ConAgra's witnesses makes clear that but for the opinion of Dr. Morris, Plaintiff would have been given the position, and that Dr. Morris's opinion was based exclusively on safety concerns. Ex. 37 p.80; Ex. 37 p.119 lines 18-22, and p.120 lines 3-5.

In cases such as this one, where the employer disqualifies an individual due to safety concerns, the decision must be evaluated under the direct-threat

[6] The job description lists 15 essential functions, s*ee* Ex. 37 at 94, but in response to an interrogatory asking which functions he could not perform, ConAgra could not identify any. Ex. 37 p.13 (answers to interrogatories two and three).

affirmative defense and not as part of the inquiry into whether the plaintiff is qualified. The Fifth Circuit has clearly identified what an employer must show when its adverse employment decision regarding an individual applicant is based on safety concerns about the individual. In *EEOC v. Exxon Corp.*, 203 F.3d 871 (5th Cir. 2000), the court held that the direct-threat analysis did not apply to across-the-board rules where the employer has adopted a safety standard applicable to all employees of a given class. *Id.* at 875. However, in cases where there is no across-the-board rule and the employer denies a job to an individual applicant for safety reasons, the direct-threat defense is the employer's only defense. As stated by the Fifth Circuit:

> We have found nothing in the statutory language, legislative history or case law that persuades that the direct threat provision addresses safety-based qualification standards in cases where an employer has developed a standard applicable to all employees of a given class. We hold that an employer need not proceed under the direct threat provision of § 12113(b) in such cases but rather may defend the standard as a business necessity. **The direct threat test applies in cases in which an employer responds to an individual employee's supposed risk that is not addressed by an existing qualification standard.** In so holding, we note that direct threat and business necessity do not present hurdles that comparatively are inevitably higher or lower but rather require different types of proof. Direct threat focuses on the individual employee, examining the specific risk posed by the employee's disability. *See* 29 C.F.R. § 1630.2(r). In contrast, business necessity addresses whether the qualification standard can be justified as an across-the-board requirement. Either way, the proofs will ensure that the risks are real and not the product of stereotypical assumptions.

*Id.* (emphasis added). ConAgra had no across-the-board qualifications standard that applied under the facts of this case; its decision was based solely on its supposed risk regarding Rodriguez. The direct-threat test therefore applies as Plaintiff's protection from "stereotypical assumptions."

ConAgra has knowingly and quite deliberately chosen not to raise this defense. *See* 3 R 539 (ConAgra's answer; direct-threat not raised); 2 R 453 (ConAgra's Response to Plaintiff's Motion for Partial Summary Judgment, emphasizing that it did not plead direct threat). Furthermore, even if it had been raised, for the reasons discussed in the brief supporting Plaintiff's Motion for Partial Summary Judgment (*see* 2 R 419-424, Plaintiff's summary-judgment briefing on direct threat) there is no evidence from which a reasonable fact finder could rule in favor of ConAgra on this point. As a matter of law Rodriguez was qualified for the position he sought, and the sole reason for the withdrawal of the job offer was a concern over safety.

## III. <u>ConAgra Withdrew the Offer Because of the Perceived Disability</u>

The employer's motive in the present case is undisputed. Given its interrogatory answers and the testimony of its witnesses, ConAgra cannot dispute that it withdrew the job offer solely because of unfounded concerns about Plaintiff's diabetes, and it cannot dispute that but for the disability created by its perceptions, Plaintiff would have been offered the job.

The *basis* for ConAgra's safety fears was its incorrect belief that Plaintiff's diabetes was not properly under control, but the result of this fear was the belief that Plaintiff posed a safety risk. Given that the ADA requires an individualized assessment of an applicant's abilities, ConAgra's belief that Plaintiff was not controlling his diabetes could not alone legitimize ConAgra's decision. An uncontrolled condition of any kind, in a vacuum, is meaningless. It does not matter if an individual has lost the use of his legs because he failed to take all safety precautions while skydiving or because he was shot while serving his country in Iraq; it does not matter if a person has kidney disease because she is an alcoholic or because she lacked the funds to treat a genetic condition. The issue under the ADA is not the *cause* of the medical condition; the issue is what *effect* the condition has on the individual's ability to do the job in question.

In holding that Plaintiff failed to prove that the withdrawal of the job offer was based on diabetes, the district court used an analysis that has no basis in the statute or in case law. Essentially, the district court held that: (a) failure to control diabetes would bar a plaintiff's claims based on actual disability, and (b) given that "uncontrolled diabetes" could not give rise to an actual disability claim, it also cannot give rise to a regarded as disabled claim. Both of these legal conclusions are unsupported by case law and are simply wrong.

The district court cited nine cases[7] for the proposition that failure to control a controllable condition bars a claim of disability discrimination, but none of the cases cited can be read to stand for such a broad proposition. Most of the cases cited by the court for this rule base their reasoning on *Siefken v. Village of Arlington Heights*, 65 F.3d 664 (7th Cir. 1995). However, the court misinterpreted and misapplied *Siefken* and its progeny.

In *Siefken*, a police officer with diabetes "experienced a diabetic reaction"[8] that made him disoriented, and he drove his squad car erratically for forty miles before being pulled over outside his jurisdiction by officers from other police departments. *Id.* at 665. He was discharged, brought suit under the ADA, and his case was dismissed for failure to state a claim. *Id.* at 665-666. The defendant had hired plaintiff knowing that he had diabetes and terminated him only after he caused a dangerous situation on the job. *Id.* at 665-666. On these facts the court held:

> We only hold that when an employee knows that he is afflicted with a disability, needs no accommodation from his employer, and fails to meet "the employer's legitimate job expectations," *DeLuca v. Winer Indus., Inc.,* 53 F.3d 793, 797 (7th Cir.1995), due to his failure to control a controllable disability, he cannot state a cause of action under the ADA.

---

[7] *See* 4 R 753.

[8] *Id.* at 665. The opinion does not explain what type of reaction this was, but from the whole of the opinion it appears to have been a "severe hypoglycemic reaction." *Id.* at 666.

*Id*. at 667. Thus, the holding in *Siefken* was not based on the cause (failure to control) but on the effect (unable to perform). It was not merely the failure to control his condition; the holding was based on the plaintiff's inability to meet the employer's job standards as evidenced by the actual *consequences* of that failure to control. Plaintiff's actual condition rendered him unable to perform up to required standards, which was an element of the plaintiff's prima facie case. *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 (7th Cir.1995) (listing the elements of the prima facie case).

The district court's opinion misses this point and oversimplifies *Siefken* in such a way that the court's analysis does not even address the *effect* that the so-called "failure to control" had on Plaintiff's job performance. According to the district court:

> As ConAgra points out, numerous courts have concluded, albeit on differing grounds, that an employer's adverse action in response to a plaintiff's failure to control an otherwise controllable illness does not give rise to a disability-discrimination claim.

4 R 753. Nothing in *Siefken* suggests that its holding, which makes explicit reference to job performance, could be extended to apply to situations where any effect on performance was merely theoretical. Indeed, the ADA requires both employers and the courts to evaluate an individual according to his or her *actual* abilities; an analysis that focuses on a mere alleged failure to control without any

consideration of the consequences patently violates the letter and spirit of the ADA.

Similarly, the other cases in the district court's string citation that rely on *Siefken* all involve situations where the alleged failure to control led to real performance problems on the job. *See, e.g., Burroughs v. City of Springfield*, 163 F.3d 505 (8th Cir. 1998) (police officer who had multiple hypoglycemic reactions on the job could not meet the legitimate job expectations of a police officer job and posed a direct threat); *Van Stan v. Fancy Colours, Inc*., 125 F.3d 563 (7th Cir. 1997) (employee with bipolar disorder was fired for poor performance and management style associated with his condition); *Brookins v. Indianapolis Power & Light*, 90 F.Supp.2d 993 (S. D. Ind. 2000) (court held that employee who failed to get proper treatment for alcohol problems and anxiety and was fired for failing to return to work after his doctor released him to return could not meet the employer's legitimate job expectations). As is true with *Siefken*, none of these cases support the proposition that failure to control a condition can defeat a claim without evidence of an impact on job performance.

The other cases in this string citation do not rely on *Siefken*, but instead they suggest that a plaintiff who refuses to take medication that would mitigate the condition cannot be considered as not substantially limited in a major life activity, and therefore not disabled. *See, e.g., Tangires v. Johns Hopkins Hospital*, 79 F.

Supp. 2d 587 (D. Md. 2000) (court held that plaintiff, who refused to take certain prescribed asthma medications because she believed they were unsafe despite her doctor's assurances, was not substantially limited because she failed to use available corrective measures); *Hewitt v. Alcan Aluminum Co.*, 185 F. Supp. 2d 183 (N.D. N.Y. 2001), (plaintiff was not substantially limited by his post traumatic stress disorder because he had not taken medication to control his condition and because there was no medical evidence that he had PTSD). These cases purport to rely on *Sutton*, but instead they fly in its face. In *Sutton* the Supreme Court focused on the need to assess an individual's condition as it actually exists. It is not up to an employer to determine what medication regimen it believes an employer *ought* to be utilizing; it is only up to an employer to determine whether the individual can safely perform the job at issue. But even if this Court were to accept that voluntary failure to take medications could defeat an actual disability claim, such a principle could only support summary judgment where there was actual evidence that the individual had failed to take needed medications. In this case, there is no evidence in the record that proves that Rodriguez did not take medication.

The district court's analysis then goes further awry when extended to the regarded as context. Having invented a legal rule unsupported by case law, the

court extends that rule beyond the actual disability context to cover “regarded as” claims based on perceived disability. The district court stated:

> Because an actual failure to control a controllable illness does not give rise to a disability-discrimination claim, a mistaken belief that an individual was not controlling his controllable illness similarly does not give rise to such a claim.

4 R p.755. However, there is no logical reason why this rule, even if valid in the actual disability context, can be sensibly applied in the perceived disability context. In a regarded as case, the focus is on what the defendant perceived about the plaintiff’s capabilities; in the present case ConAgra’s perceived that Rodriguez was so limited by his diabetes that he could not be employed in any manufacturing job at ConAgra’s plant. In a regarded as case the perception that matters is the employer’s view as to the limitations faced by the faced by the employee, not whatever perception the employer might hold about the cause of those limitations (such as, whether the employee is taking medications or following proper medical treatment). Perceptions of the latter type have no place in the employer’s inquiry, and no logical place in the analysis of regarded as cases.

Taking the district court’s analysis to its logical end, an employer can think: (1) that an employee should be able to control any negative effects from a health condition; (2) that the employee is failing to do so; and (3) that the employee therefore creates a safety risk on the job – and the employer can be wrong about

one or all three of these things and it doesn't matter; the employer would still be free to deny the individual the job without an individualized assessment of the employee's actual capabilities. This turns one of the main purposes of the ADA – to protect against unfounded fears and stereotypes of conditions such as diabetes – squarely on its head. In focusing on whether Defendant perceived Plaintiff as failing to control his condition, the district court failed to address the key issues presented by Plaintiff's claim and reached a conclusion unsupported by the facts or the law.[9]

The district court applied an improper legal standard in determining that Plaintiff could not prove that the withdrawal of the job offer was based on his diabetes. Properly analyzed, it is clear that the decision to withdraw the offer was based solely on the fact that ConAgra regarded Plaintiff as disabled due to his impairment.

## IV. Evidence of Control

Although it does not appear to be a basis for the district court's ruling, the court below stated there was no competent evidence that Rodriguez's diabetes was under control at the time of the physical. 4 R p.754. From the context of the discussion the court appears to be saying there was no evidence of Plaintiff's

[9] The district court dismisses as irrelevant the question of whether plaintiff actually was controlling his diabetes. In fact, plaintiff has submitted sufficient evidence to raise a triable issue of fact that his diabetes was in fact under control at the time of the employment decision, including statements by his medical experts that his diabetes was under control after May 2001.

precise blood glucose level at the moment of the physical. Because ConAgra failed to do a blood test this is certainly true, but the absence of a specific number is meaningless for two reasons.

First, as the medical evidence indicates, a person with diabetes can have a temporary spike in blood glucose. As long as the individual maintains blood glucose control over time, as measured by the hemoglobin A1C, that person is considered to be under control. As discussed above at pages 13-15, there is ample evidence of glycemic control.

Second, the concept of controlled vs. uncontrolled is not just about test results and cannot be resolved without considering what effect, if any, the individual's level of "control" is having upon the person in question. As stated by the Supreme Court:

> The use or nonuse of a corrective device does not determine whether an individual is disabled; that determination depends on whether the limitations an individual with an impairment *actually* faces are in fact substantially limiting.

*Sutton*, 527 U.S. at 488. A person may be failing to use a corrective device and not fully "controlling" a condition, but if that person is otherwise qualified and the lack of control does not affect job performance the ADA prohibits discriminatory action. Rodriguez was qualified and he was offered the job; an alleged failure to

control that does not affect one's qualifications or pose a direct threat has no bearing on the ADA analysis.

## CONCLUSION

Properly analyzed this is a safety case. Plaintiff proved all elements of his case as a matter of law, and for strategic reasons ConAgra chose not to assert an applicable defense. Plaintiff is therefore entitled to summary judgment on liability as requested in his motion for partial summary judgment in the district court.

Plaintiff therefore requests the following relief. This Court should reverse the district court's Final Judgment, enter an order granting the relief requested in Plaintiff's Motion for Partial Summary Judgment, and then remand the case to the district court for trial on damages and further proceedings consistent with the Court's rulings.

In the alternative, should the Court believe there are fact issues that would defeat Plaintiff's right to a partial summary judgment, Plaintiff requests the following relief. This Court should reverse the district court's Final Judgment, and remand the case to the district court for further proceedings consistent with the Court's rulings.

Respectfully submitted,

______________________________

Donald E. Uloth
Uloth & Peavler, L.L.P.
3400 Carlisle Street
Suite 430, LB 23
Dallas, Texas 75204
Phone: (214) 999-0550
Fax: (214) 999-0551
Counsel for Appellant

## CERTIFICATE OF SERVICE

I certify that both a paper copy and an electronic copy of the foregoing Brief of Appellant Rudy Rodriguez has been served to the counsel identified below by United States Postal Service Express Mail on this 9th day of February, 2005.

Helen Thigpen
Haynes and Boone, L.L.P.
2502 N. Plano Rd., Suite 4000
Richardson, Texas 75082-4101

___________________________

Donald E. Uloth

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type-Style Requirements

1. This brief complies with the type-volume limitations of FED R. APP. P. 32(a)(7)(B) because:

- this brief contains 9,289 words, excluding the parts of the brief exempted by FED R. APP. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of FED R. APP. P. 32(a)(5) and the type-style requirements of FED R. APP. P. 32(a)(6) because:

- this brief has been prepared in a proportionately-spaced typeface using Microsoft Word 2002 in Times New Roman, font size 14.

______________________________

Donald E. Uloth
Attorney for Appellant, Rudy Rodriguez
Dated: February 9, 2005